IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | |
|---|---|
| BROTHELLA QUICK, BQ ENTERPRISES, INC., and CRYSTAL CLEAR COMPASSIONATE CARE, INC. | ) ) ) ) |
| PLAINTIFFS, | ) ) |
| v. | ) NO: 19-cv-7797 ) |
| DEBORAH HAGAN, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE ILLINOIS DEPARTMENT OF FINANCIAL AND PROFESSIONAL REGULATION, | ) ) ) Hon. Judge Mary M. Rowland ) ) Mag. Judge M. David Weisman |
| and | ) ) |
| BRETT BENDER, DEPUTY DIRECTOR OF MEDICAL CANNABIS, IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES, | ) ) ) |
| and | ) ) |
| AS YET UNKNOWN DEFENDANTS, | ) ) |
| DEFENDANTS. | ) |

THIRD AMENDED COMPLAINT

Plaintiffs, Brothella Quick, BQ Enterprises, Inc., and

Crystal Clear Compassionate Care, Inc., by and through their

undersigned attorneys, Loevy & Loevy, hereby submit this

complaint against Defendants Deborah Hagan in her official

capacity as Secretary of the Illinois Department of Financial

and Professional Regulations, Brett Bender, Deputy Director of

Medical Cannabis in his individual and official capacities, and

As Yet Unknown Defendants.  In support of the relief requested herein, Plaintiffs state as follows:

<u>Introduction</u>

1.    In 2014, the Generally Assembly passed a law to award licenses to a limited number of companies to sell medical marijuana in Illinois. Called the "Compassionate Use of Medical Cannabis Act" (the "Act"), the law created for the first time in Illinois a system of licensing dispensaries through which it would be legal to sell marijuana to patients suffering from conditions that are alleviated by marijuana (the "Compassionate Use Program" or "Program"). The Act places the Illinois Department of Financial and Professional Regulation ("IDFPR" or "Department") in charge of the licenses.

2.    The Act created licenses for 60 medical marijuana dispensaries, and required IDFPR to award all 60 of them if there were 60 qualified applicants. If there were more than 60 qualified applicants, the Act required the Department to make awards using a competitive grading process.

3.    Because there were only 60 licenses for the entire state, the licenses were valuable. In the years that followed, some recipients of the licenses have sold their dispensaries for substantial sums.

4.    Because over 200 companies submitted an application for the licenses before the deadline in 2014 ("applicant"), the

2

Department used a competitive scoring process for some of the
licenses.

5.   Crystal Clear Compassionate Care, Inc. ("CCCC") was a
qualified applicant, but it did not achieve the highest score in
the district where its proposed dispensary was located.
Accordingly, it was not awarded a dispensary registration.

6.   Plaintiff, BQ Enterprises, Inc. was an applicant owned
by Plaintiff Brothella Quick (together, "BQ"). BQ was a
qualified applicant but it did not achieve the highest score in
the district where its proposed dispensary was located.
Accordingly, it was not awarded a dispensary registration.

7.   Although many of the companies that participated in
the competition were of diverse ownership (owner groups
consisting of women, first generation immigrants and people of
color), the Department almost exclusively selected companies
that had white men as the majority owners. For more than one-
third of these companies, over 20, the winners received their
licenses because they were allowed to change their dispensary
addresses after the application deadline, and before
registering, so that the company could qualify to register.

8.   These companies were permitted to change the location
of their proposed dispensary (essentially to amend the location
portion of their applications) even though the specific property
location was one of the bases upon which the scores were

awarded. Among the scored application sections relating to the specific property are: the suitability for public access, the plot plan, the community benefits plan, the facility security subsection of the security plan, and the local/community neighborhood report.

9.   Absent the amendments, the companies' proposed locations would not have qualified under the Act and they would not have been allowed to register a dispensary.

10.   In at least one of these instances, the company had not even secured property at all at the time of the application. Thus, at the time of the application it had no property, not even non-compliant property, in the district in which it was later allowed to register.

11.   For example, the company that beat CCCC in District No. 48, The Herbal Care Center, a/k/a Custom Strains LLC ("THC"), received the high score in District No. 48 but applied with property that did not meet the zoning requirements of the Act. CCCC, by contrast, had compliant property. After the application period closed, and after the applications were graded, THC identified a new property with an address that would allow it to qualify under the Act.

12.   IDFPR allowed THC to change its address, even though there was no formal procedure allowing an applicant to make such a change and even though the application rules required all

applicants to supply the address of the proposed dispensary in the initial application. THC was allowed to register as a dispensary in District No. 48 only because it later identified qualified property in District No. 48, after the close of the application grading period, and IDFPR allowed it to change the location even though no rule provided for it.

13.   CCCC's and BQ's respective applications were compliant with all requirements, and each has now identified qualified property in a district with an available license, *i.e.*, a district where no other applicant has to date sought to register.   CCCC and BQ are similarly situated to the more than one-third of companies receiving licenses that the IDFPR allowed to move, *inter alia*, in that none of those more than 20 companies had compliant property in the district in which they eventually sought to register until after the application process had closed.

14.   Accordingly, CCCC and BQ wrote IDFPR to request the opportunity to change their proposed dispensary locations (as THC did), supplying all necessary information.

15.   However, by letters dated November 6, 2019, the IDFPR announced its decision not to allow CCCC or BQ to change their addresses, even though it allowed THC, and other companies, to do so.

16.  CCCC and BQ bring this action for two related reasons. First, there was no valid basis to refuse their requests. Among other reasons why its refusal was improper, the IDFPR relied on a rule which (a) does not foreclose the change BQ requested, (b) was enacted after BQ and CCCC submitted their original applications and (c) did not even justify the ad hoc decisions to allow the other companies to change their addresses, as it postdated those decisions by more than a year.

17.  Second, the IDFPR has misapplied the Act in a manner which violates the law and deprives Plaintiffs of their due process protected entitlement to a license. As a qualified applicant with property for a dispensary in an open district, BQ and CCCC have an expectancy of receiving the license because the Act by its plain terms requires IDFPR to award as many of the 60 licenses as there are qualified applicants with property.

18.  Additionally, IDFPR has awarded only 55 of the 60 required licenses based on a misapplication the Act. In particular, it divided the state into various districts and allocated amongst them the 60 licenses it would award. In the over 200 applications, there were five allocated licenses in districts for which no company submitted an application proposing property in the district. As a result, IDFPR did not award these five licenses.

19.  BQ obtained property and approved zoning for a dispensary in one of these five districts, and, on September 25, 2019, requested to change the address in their application to this new location, just as the IDFPR had allowed more than 20 other companies to do to obtain their licenses. Also just like those companies, BQ made the request after the application period was closed and before any new application period was announced. (Indeed no new application period has been announced as of the filling of this suit). The request, as well as BQ's underlying application, identified Ms. Quick as an African American woman. Defendant Bender reviewed the request and denied it in a letter dated November 6, 2019.

20.  CCCC obtained property and approved zoning for a dispensary in one of these five districts, and, on September 25, 2019, requested to change the address in their application to this new location, just as the IDFPR had allowed the five other companies to do to obtain their licenses. Also just like those companies, CCCC made the request after the application period was closed and before any new application period was announced. The request, as well as CCCC's underlying application, identified Ms. Anderson and Ms. Davis as African American women. Defendant Bender reviewd the request and denied it in a letter dated November 6, 2019.

21.   In denying CCCC's and BQ's respective requests to change their addresses, Bender and IDFPR justified the decision based on an inapplicable rule, 69 Il. Admin. Code 1290.140(a). The rule, as enacted in 2014, governed changes of address by an existing, registered dispensary – providing for shutting down existing operations and moving to a new location. The rule was amended in 2018 to provide for changes of address by both registered dispensaries and applicants that have received an authorization to register but are not yet registered. This amendment occurred approximately three years after IDFPR allowed all of the aforementioned companies to change addresses and/or districts, meaning that it is not the provision under which IDFPR allowed those changes. Rather those changes were allowed, if at all, pursuant to other rules or the inherent powers of the agency, meaning that Section 1290.140(a) provides no justification for treating BQ differently.

22.   Moreover, nothing in the rule forbids the change CCCC and BQ requested as an original applicant that has yet to receive an authorization to register, just as nothing in the 2014, pre-amended, version of the rule forbade IDFPR to allow address changes by original applicants that had not yet registered. Both are outside of the respective versions of 1290.140(a).

23.  Moreover, IDFPR's reason for the differential treatment, which is that the other companies sought to change addresses within a district instead of between districts, is legally insufficient, and in fact contradicts the express requirements of the Act.

24.  First, when the IDFPR allowed the other companies to move their addresses there was no statutory provision or rule limiting such moves to within a district. There is still no such rule or provision. The address changes allowed these companies to qualify to register a dispensary and they would not have otherwise qualified for the license they received.

24.  Second, the districting system itself is not specified in the Act. The reason the Department promulgated the districts was as a method to distribute the authorized dispensaries geographically across the state. This methodology was a choice by the agency, among potential alternatives. It cannot justify failing to adhere to an express provision of the Act.  It also cannot justify awarding less than 60 licenses if there are applicants with qualified property. BQ and CCCC are each an applicant with qualified property, and the award of one of the five remaining licenses to each of them is thus mandatory under the Act. 410 ILCS 130/115 ("The Department of Financial and Professional Regulation may not issue less than 60 licenses if there are qualified applicants who have applied with [IDFPR].").

25. Third, no applicant previously sought a license for the districts where BQ (District No. 23) and CCCC (District No. 28), respectively, have obtained an address. Each is the first, and only, applicant to present qualified property to IDFPR in that district, respectively. And no other applicants have done so since.

26. BQ is a qualified applicant. Had BQ initially submitted its application using the property it later obtained in District 23 instead of the property and District it listed in its application, nothing about that change would have been disqualifying.

27. CCCC is a qualified applicant. Had CCCC initially submitted its application using the property it later obtained in District 28 instead of the property and District it listed in its application, nothing about that change would have been disqualifying.

28. In other words, there is nothing about the properties BQ and CCCC have secured in Districts 23 and 28 that would be disqualifying under the rules and grading standards used when IDFPR scored the applications and awarded the authorizations to register.

29. IDFPR and Bender denied Plaintiffs the same treatment afforded to the companies that were allowed to change addresses in order to qualify for a license. Plaintiffs are similarly

situated to those companies. There is no basis in the Act nor
the applicable rules for treating them differently than those
companies and no rational, non-invidious basis to do so. Both
due process and equal protection require affording them the
relief sought herein.

## Jurisdiction and Venue

30.  This court has jurisdiction pursuant to 28 U.S.C. 1331
and 28 U.S.C. 1367 as Plaintiffs bring a federal claim arising
under the United States Constitution as well as a state law
claim so related as to form part of the same case or
controversy.  Venue is proper as the events giving rise to these
claims occurred in this district, the Plaintiffs reside in this
district and the agency Defendant maintains its offices in this
district.

## The Plaintiffs

31.  CCCC was created by two African American women,
Crystal Anderson and Maria Davis. Both have long careers as
licensed Nurse Anesthetists working with patients in Illinois.
From their experience they recognized the need for for
alternative treatment options for Illinois patients for health
conditions ranging from pain control to anxiety, to life
threatening illnesses such as cancer. They teamed up to found
CCCC believing both their professional expertise and the

diversity the offered as women of color would be a benefit to
Illinois' burgeoning medical marijuana program.

32.   After much work and expense, Ms. Anderson and Ms.
Davis were able to obtain property in District No. 48 and to
prepare a 100+ page application, employing their own skills, as
well as those of architects, security professional consultants,
and others.  They timely submitted CCCC's application to IDFPR,
before the deadline, in September of 2014. CCCC's application
also included the Verification of Minority-Owned, Female-Owned,
Veteran-Owned or Disabled Person-Owned Business, identifying the
owners as African American women.

33.   BQ was created by Brothella Quick, an African American
woman and longtime healthcare entrepreneur with a degree in
nursing from Howard University and a distinguished record of
working in the public health, including serving as a 2nd
Lieutenant in the United States Public Health Service. From this
experience, she recognized the need for alternative treatment
options for Illinois patients for health conditions ranging from
pain control to anxiety, to life threatening illnesses such as
cancer. After much work and expense, Ms. Quick was able to
prepare a 100+ page application, employing her skills, as well
as those of architects, security professionals, consultants and
others.  She timely submitted the application to IDFPR, before
the deadline, in September of 2014. The application also

included the Verification of Minority-Owned, Female-Owned, Veteran-Owned or Disabled Person-Owned Business, identifying Ms. Quick as a female African American veteran.

34. IDFPR disqualified numerous applicants because they failed to comply with various requirements of the Act and rules, and/or failed to achieve minimum criteria in each category. There were no qualification requirements associated with the chosen District, aside from those associated with the proposed location within that District.

35. BQ was not disqualified. Rather, IDFPR reviewed and scored BQ's application, but awarded the license to another applicant because it was the high scorer in the district for Evanston, where BQ had property.

36. CCCC was not disqualified. Rather, IDFPR reviewed and scored CCCC's application, but awarded the license to another applicant because it was the high scorer in the district for Evanston, where CCCC had property.

## The Licensing Process

37. In order to be considered for a license, applicants had to qualify by complying with various requirements of the Act, rules, and mandatory criteria. The applicants that failed the mandatory criteria were disqualified. 69 Il. Admin. Code 1290.60. The Department sent notice informing those applicants that they had been disqualified.

38.   The remaining, qualified applicants could become entitled to a dispensary license in one of two ways. First, if the number of qualified applicants with an address in a given district was less than or equal to the number of licenses IDFPR allocated to that district, then the applicant was entitled to a license. Id. § 1290.60(e).

39.   However, if the number of applicants with an address in the district exceeded the allocated licenses, then the IDFPR would use a scoring process to select the winner. Id.

40. The district for Evanston, where BQ had its application address, had enough qualified applicants to trigger the scoring process. District No. 23 did not.

41.   District No. 48, where CCCC has its application address, had enough qualified applicants to trigger the scoring process. District No. 28 did not.

District/Address Changes

42.   After the application deadline, IDFPR allowed at least two applicants to change the district in which they applied to one where they had compliant property.  The Department did so despite the fact that there was no rule specifically providing for such changes.

43.   After the application deadline, IDFPR allowed at least twenty additional applicants to change the address within the district for the proposed dispensary in their applications.

44. For example, THC obtained the highest score in the District No. 48 competition, meaning it would be entitled under to register under § 1290.60(e) in District No. 48 if it had compliant property.

45. But the property address that THC used in its application did not receive zoning to operate a dispensary, thereby making it ineligible under the requirements of the Act.

46. Thereafter THC obtained new property, after the results of the competition were announced, that met the requirements of the Act. IDFPR had no rule specifically allowing an applicant to change addresses prior to registration, yet it allowed THC to change to that new address even though the application period had closed. It similarly allowed at least four other applicants to change addresses under analogous circumstances.

## Differential Treatment of CCCC and BQ

47. Like THC and other companies, CCCC and BQ obtained compliant property after the application period had closed, property in District Nos. 28 and 23, respectively. Also like these companies, and those allowed to switch districts to a district where they had compliant property, BQ and CCCC, were qualified applicants that submitted an application during the open application period before the deadline in 2014. Like these other companies, reviewers did not disqualify either CCCC or BQ.

Like these other companies, CCCC and BQ sought to change to a new address after the application period had closed.

48.   Unlike with the companies that changed their application district, and unlike with the companies that changed their addresses, IDFPR refused to allow CCCC or BQ to change. This refusal was without basis in law, and cannot stand.

<u>BQ and CCCC Have Vested Rights To The Registrations</u>

49.   BQ is, and remains, the only qualified applicant that timely applied (before 3 p.m. on September 22, 2014) for licensure under the Program, that satisfied the mandatory criteria, and that has submitted paperwork to IDFPR establishing a compliant address in District No. 23.

50.   CCCC is, and remains, the only qualified applicant that timely applied (before 3 p.m. on September 22, 2014) for licensure under the Program, that satisfied the mandatory criteria, and that has submitted paperwork to IDFPR establishing a compliant address in District No. 28.

51.   No qualified applicant other than BQ has ever requested IDFPR to authorize it to register in District No. 23.

52.   No qualified applicant other than CCCC has ever requested IDFPR to authorize it to register in District No. 28.

53.   Upon submitting the paperwork, and upon being the only qualified applicant seeking registration in District No. 23, BQ obtained vested rights to the one license allocated there.

54.   These rights cannot be divested even if the IDFPR attempts to open a new application period for District Nos. 23 or 28 or otherwise attempts to accept later-submitted paperwork from a 2014 applicant seeking to move addresses.

**COUNT I – Administrative Review**

55.   Plaintiffs reallege all allegations of this complaint as if fully set out herein.

56.   On or about November 6, 2019, IDFPR made final administrative decisions affecting Plaintiffs' rights. A copy of the decisions are attached hereto.

57.   The court should review the decisions because they are not in accordance with the law, *inter alia*, for the reasons explained in this complaint.

58. IDFPR, via its officials, is requested to file an answer to this Complaint consisting of the administrative record of the proceeding resulting in the decisions (as redacted to protect CCCC's and BQ's trade secrets).

59. Plaintiffs have exhausted all available remedies under the Administrative Review Law and has no further plain, speedy, adequate remedy under the law.

WHEREFORE, Plaintiffs demand an injunction or order: (1) prohibiting the Defendants Deborah Hagan and Brett Bender and As Yet Unknown Defendants in the official capacities from awarding the registration or authorization for registration for District

Nos. 23 or 28 to any applicant or person other than Plaintiffs; (2) requiring Defendants to register and/or issue an authorization to register for a dispensing organization at Plaintiffs' chosen addresses in District Nos. 23 and 28; and, (3) issue Plaintiffs early approval secondary site adult use licenses upon submission of the paperwork and payments required of the original 55 licensees. Plaintiffs further demand their costs and attorneys' fees and all other relief to which they may be entitled as well as damages against Defendant Bender in his individual capacity.

### COUNT II – 42 U.S.C. § 1983
### Due Process

60.   Plaintiffs reallege all allegations of this complaint as if fully set out herein.

61.   By all of the above, Defendants, and each of them, have deprived Plaintiffs of rights under the United States Constitution including, without limitation, rights to property protected by due process of law.

62.   Plaintiffs have been injured as a direct and proximate result.

63.   Plaintiffs are entitled to compensatory damages and injunctive damages including, without limitation, issuance of dispensary organization licenses/registrations under the Act and/or an order prohibiting the issuance of a

license/registration in District Nos. 23 and/or 28 until
Plaintiffs' rights can be fully and finally adjudicated by the
agency and/or this court and/or by all available courts of
appeal.

WHEREFORE, Plaintiffs demand an injunction or order: (1)
prohibiting the Defendants Deborah Hagan and Brett Bender and As
Yet Unknown Defendants in the official capacities from awarding
the registration or authorization for registration for District
Nos. 23 or 28 to any applicant or person other than Plaintiffs;
(2) requiring Defendants to register and/or issue an
authorization to register for a dispensing organization at
Plaintiffs' chosen addresses in District Nos. 23 and 28; and,
(3) issue Plaintiffs early approval secondary site adult use
licenses upon submission of the paperwork and payments required
of the original 55 licensees. Plaintiffs further demand their
costs and attorneys' fees and all other relief to which they may
be entitled as well as damages against Defendant Bender in his
individual capacity.

### COUNT III – 42 U.S.C. § 1983
### Equal Protection – United States Constitution

64. Plaintiffs reallege all allegations of this complaint
as if fully set out herein.

65. Plaintiffs were denied the right to change the address
of their proposed locations when similarly situated white- and

male-owned applicants were permitted to do so. Several months before denying Plaintiffs' request to change addresses, the State of Illinois and IDFPR disparately benefited these same companies when amending the Act, creating rights to up to 60 new "Early Approval" secondary site dispensary licenses. 410 ILCS 705/15-15. Because, as described above, the State awarded 55 of the 60 available dispensary licenses in the original round, there are likewise 55 businesses eligible for Early Approval secondary site licenses.

66. These 55 new Early Approval dispensary licenses are extremely valuable. Each is worth millions of dollars.

67. In amending the Act, the State placed extreme limitations on the people who were eligible to win these valuable 55 Early Approval dispensary licenses.

68. Specifically, the Act as amended provides that the only people eligible to win the 55 new Early Approval dispensary licenses are the set of people who own companies holding existing dispensary licenses.

69. However, the only companies with existing dispensary licenses are majority-owned by Caucasian males. There are zero companies with existing dispensary licenses majority-owned by women or by minorities.

70.    As such, there are no minority-owned or female-owned companies in the State of Illinois that were eligible for any of these new 55 Early Approval dispensary licenses.

71.    To try to justify this unequal distribution of valuable State resources, the amended Act further provides that minority-owned and female-owned businesses, while ineligible to apply for any of the 55 Early Approval licenses, would nonetheless be eligible to apply for a third round of dispensary licenses, consisting of 75 new "Conditional Adult Use" licenses, scheduled to be awarded by the end of 2021.

72.    These 75 Conditional Adult Use dispensary licenses for which minority- and female-owned businesses are eligible are far less valuable than are the 55 Early Approval dispensary licenses for which they are not eligible.

73.    Specifically, exclusively white and male companies that are awarded one of the 55 Early Approval dispensary licenses have the ability to select sites, receive governmental approval, and open for business before any minority- or women-owned companies have an opportunity to do any of those things.

74.    By the terms of the amended Act, the white- and male-owned companies that were eligible for Early Approval licenses were permitted to begin their preparations as early as June 2019, when the amendment passed. Each such company has had more than a full year to select locations, purchase property, apply

for local zoning and special use approval, attend hearings regarding the same, design and build their sites, hire staff, and open for business. With that much lead time, and freed by the Department from having any competition from minority- and female-owned companies, many of the 55 white- and male-owned companies awarded Early Approval dispensary licenses have already opened for business in some of the prime real estate in the State.

75.    The 75 Conditional Adult Use dispensary licenses for which minority- and female-owned businesses are eligible have not, and cannot, even begin the process of getting off the ground until 2021, at the earliest. The State has not yet even completed the process for awarding the 75 Conditional Adult Use dispensary licenses.

76.    Moreover, whereas the 55 white- and male-owned company-applicants were automatically awarded the (more valuable) Early Approval versions without having to compete for them, all minority- and female-owned applicants will have to win a Conditional Adult use licenses in a point-based competition where they confront the risk of denial.

77.    Additionally, even after the State eventually announces which 75 companies it selects to receive awards of Conditional Adult Use dispensary licenses, and assuming that at least some of those 75 companies are in fact minority- and/or

female-owned, it will be at least a year, and likely far longer, before any of those businesses can open their doors and begin competing with the 55 white- and male-owned Early Approval license holders.

78.  When the Department eventually does award 75 Conditional Adult Use dispensary licenses, assuming there are some minority- and female-owned businesses, the winners will be forced to compete with each other to secure locations.

79.  Moreover, the rules have been intentionally and systematically designed to favor the existing white- and male-owned companies over any future minority- or female-owned companies, including by building in structural delay for the latter businesses to even begin competing. For example, when the Conditional Adult Use recipients' locations are selected and secured, the Act provides that none of these 75 Conditional Adult Use dispensary license winners will receive authorization to begin building out their businesses until the Department conducts a physical inspection of the sites selected by those minority- and female-owned businesses to verify that the site is suitable and sufficient in size, power allocation, lighting, parking, handicapped accessible parking spaces, accessible entry and exits as required by the Americans with Disabilities Act, product handling, and storage.

80.   There was and is no such pre-inspection requirement
described in the preceding paragraph applicable to the 55 white-
and male-owned Early Approval dispensary licensed businesses.
While the properties of those white- and male-owned businesses
must also be suitable and sufficient, there is no comparable
requirement that the Department must first come and physically
inspect a proposed site before any construction build-out can
commence. Instead, the 55 white- and male-owned holders of Early
Approval dispensary permits have been and will continue to be
allowed to commence and complete their construction without
having to wait for any pre-construction inspections.

81.   This pre-construction inspection requirement that all
minority- and female-owned dispensaries will face will create
unacceptable delay, particularly given the practical inability
of the Department to timely conduct 75 inspections, even without
the Covid-19 crisis. This rule will thus unnecessarily delay the
time period when minority- and female-owned businesses are
eligible to begin competing with the white- and male-owned
businesses.

82.   There are other unfair competitive advantages
associated with the fact that the white- and male-owned Early
Approval dispensary businesses were permitted to open prior to
the time that minority- and women-owned businesses can open
Conditional Adult Use-licensed businesses.

83.  Specifically, because of the setback requirements in the Act, no competing dispensary is allowed to open within 1,500 feet of an existing dispensary. As a result, the white- and male-owned businesses will be permitted to establish their locations in some of the most valuable real estate in the State, effectively blocking prospective minority and female owned businesses from locating nearby and competing with them. Indeed, through strategic site selection, the white-owned shops can effectively exclude minority-owned dispensaries from locating in entire neighborhoods, given the 1,500 feet requirement and the limited available zoning for cannabis companies.

84.  Already, white- and male-owned businesses with Early Approval licenses have sought approval in the most desirable locations in the City of Chicago, including, for example, the Fulton Market District and the Wrigleyville neighborhoods. Other Early Approval licensed-businesses have secured the most valuable opportunities in other areas of the State as well.

85.  By the time any minority- or female-owned businesses are awarded Conditional Adult Use dispensary licenses in 2021, at the earliest, those minority and female businesses will be precluded from entering those neighborhoods already claimed by the white and male Early Approval license holders. The minority- and female-owned businesses are thus effectively eligible only

for the "left-over" choices, after the white- and male-owned
businesses have first choice of the most desirable locations.

86.  Additionally, a number of jurisdictions have enacted
ordinances that only permit one (1) cannabis dispensary business
in that particular town, city, or county. For each such town,
city, and county, the 55 exclusively white- and male-owned
businesses have the first, and only, opportunity to secure
locations, petition for and secure local approval, and obtain
all necessary construction and building permits. In those
jurisdictions, the 55 exclusively white- and male-owned
businesses will effectively exclude all potential minority- and
female-owned businesses from operating in these jurisdictions.

87.  Even in those cities, towns and counties that will
allow more than one dispensary, the ability of the white- and
male-owned businesses to secure an Early Approval dispensary
license as opposed to a Conditional Adult Use dispensary license
provides an extremely unfair competitive advantage. An extra
runway of at least a year, and possibly longer, will permit
these white- and –male owned businesses to establish customer
and supply relationships, as well as financial stability, long
before the minority- and women-owned businesses are even
eligible to compete. By the time any minority- and women-owned
businesses are allowed to open for business, the competitive
business advantage enjoyed by the 55 exclusively white- and

male-owned companies will be effectively insurmountable, particularly where virtually all of the white- and male-owned dispensaries are integrated and affiliated with cultivation operations, an advantage not enjoyed by any of the minority- and women-owned businesses seeking dispensary licenses.

88. Many of the foregoing disabilities do not apply to the medical cannabis licenses that Plaintiffs seek. Indeed, had Defendants awarded Plaintiffs authorizations to register then Plaintiffs would have enjoyed the much of the same advantages as the white- and male-owned dispensaries.

89. Plaintiffs are comparable in all material respects to the applicants that were allowed to change addresses after the application deadline and before being registered.

90. The guarantee of equal protection requires that the government treat similarly situated individuals in a similar manner. For the reasons described in this Complaint, Plaintiffs have been denied equal protection of the law in violation of the Fourteenth Amendment to the United States Constitution. Plaintiffs, who are members of suspect classes, were treated differently from similarly situated non-minorities and males, absent any legitimate governmental interest that could rationally justify this discriminatory treatment, much less any that could survive strict scrutiny. Similarly, there is no rational basis for the disparate treatment Plaintiffs suffered.

As a result of the unjustified disparate treatment, Plaintiffs have suffered injuries, including but not limited to economic harms.

WHEREFORE, Plaintiffs demand an injunction or order prohibiting the Defendants Illinois Department of Financial and Professional Regulation and Brett Bender and As Yet Unknown Defendants from awarding the registration or authorization for registration for District Nos. 23 or 28 to any applicant or person other than Plaintiffs and requiring Defendants Illinois Department of Financial and Professional Regulation and Brett Bender and As Yet Unknown Defendants to issue Plaintiffs authorization to register and/or a registration for a dispensing organization at Plaintiffs' chosen addresses in District Nos. 23 and 28 as well as early approval secondary site adult use licenses upon submission of the items required of the original 55 licensees. Plaintiffs further demand their costs and attorney's fees and all other relief to which they may be entitled.

## COUNT IV – ILLINOIS CONSTITUTION
### Equal Protection

90. Plaintiffs reallege all allegations of this complaint as if fully set out herein.

91. On the basis of the allegations contained in the preceding paragraphs, Plaintiffs have also been denied equal protection of law in violation of the Illinois Constitution. As a result, Plaintiffs have suffered injuries, including but not limited to economic harms.

WHEREFORE, Plaintiffs incorporate and restate the prayer for relief set forth in the previous Count.


<u>JURY TRIAL DEMANDED</u>

Plaintiffs demand trial by jury on all issues so triable


RESPECTFULLY SUBMITTED,


/s/Jon Loevy


Jon Loevy
Michael Kanovitz
Loevy and Loevy
311 N. Aberdeen Street
Chicago, IL 60607